**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DONNA A. BLACK,<br><br>Plaintiff,<br><br>v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>Defendants. | Case No. 24-cv-1449 (JMC) |

**MEMORANDUM OPINION**

During her first year in high school, D.B. was suspended several times for fighting. Eventually, school officials tried to force her to transfer to another high school. At the beginning of her second year, the officials carried out that transfer. The Superior Court for the District of Columbia promptly ordered them to undo it. Now, D.B.'s mother—Donna Black—brings this lawsuit challenging the longest of D.B.'s suspensions as well as her forced transfer. She says both of those actions were done in a manner that violated D.B.'s procedural due process rights under the Fifth Amendment and ran afoul of a D.C. law called the Student Fair Access to School Amendment Act of 2018. Black seeks to recover monetary damages and asks the Court for an injunction that will ameliorate ongoing harm from the past violations and prevent future violations. Because Black has failed to state a plausible constitutional claim, and because the Court declines to exercise supplemental jurisdiction over the remaining state law claim, the Court **GRANTS** the District's motion to dismiss.[1]

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

## I. BACKGROUND

D.B. began her freshman year at Calvin Coolidge Senior High School—a high school within the District of Columbia Public Schools (DCPS) system—in August 2022. *See* ECF 1-37 ¶¶ 3, 35. A few months into her time at Coolidge, "D.B. began experiencing verbal and physical assaults from other students." *Id.* ¶ 38. One of those incidents took place on a Friday late in October. *See id.* ¶ 40. That day, "another student spat on D.B. during a verbal disagreement." *Id.* The following Monday, "D.B. was involved in a physical altercation with the same student who spat on her . . . and that student's friends." *Id.* ¶ 42.

Coolidge's assistant principal contacted D.B's mom—Donna Black, the plaintiff in this case—the day of the physical altercation and told her that the "incident was on him" because "the school failed to intervene after" the spitting incident. ECF 1-37 ¶ 44. The assistant principal asked Black to "keep D.B. and her sister home the next day" and to "give him a day to handle the situation." *Id.* ¶ 45. D.B. went back to school on Wednesday—apparently having followed the assistant principal's direction to stay home on Tuesday—and "[a]nother large group fight" including "D.B. and the same students" from the prior incidents broke out. *Id.* ¶ 47.

Coolidge's dean of students called Black that night and left her a voicemail. *See* ECF 1-37 ¶ 48. He said that "D.B. should stay home, and that the school would call to follow up" in two days—on Friday. *Id.* But Black did not hear from the school on Friday. *See id.* ¶ 49. So on Monday, "having received no communication from the school and concerned for her daughter's education," Black sent the dean a text message "requesting an update." *Id.* ¶ 50. In response, the dean told Black that D.B. and her sister were "not supposed to enter the building." *Id.* The dean "did not say how long D.B. and her sister were supposed to remain out of school." *Id.*

A few days later, Black and D.B. went together to Coolidge hoping to get D.B. back into school. *See* ECF 1-37 ¶¶ 52–54. "[S]chool security stopped" D.B. from coming into the building

and called the dean to come speak to D.B. *Id.* ¶ 54. The dean told D.B. she "was not permitted to enter the building because of an alleged ongoing police investigation" into the most recent fight. *Id.* ¶ 55. Black then reached out to DCPS's central office and, at the urging of an employee there, tried unsuccessfully to get in touch with Coolidge's principal. *See id.* ¶¶ 57–58.

"D.B. then remained out of school for almost three weeks, without any contact from Coolidge staff, her teachers," or the central office. ECF 1-37 ¶ 59. Feeling "frustrat[ed] and "hopeless[]," D.B. called and "left a voicemail for" her principal. *Id.* ¶ 61. The principal returned her call and scheduled a meeting with D.B. and her mother for a few days later. *See id.* But at that meeting, the principal "refused to believe that D.B. had been assaulted by the other students and instead accused D.B. and her sister of provoking the fight." *Id.* ¶ 62. The principal told D.B. that she "was still not permitted to return to school and also proposed that D.B. be transferred to another school." *Id.*

The day after the meeting, Black again reached out to the central office. *See* ECF 1-37 ¶ 64. The same employee she had previously talked to "agreed to discuss the situation" with DCPS's instructional superintendent. *Id.* Five days later, that superintendent called Black and told her that she planned to "meet[] with Coolidge staff to discuss the situation and would be in touch" with Black after that "to confirm D.B.'s return to school." *Id.* ¶ 65. Two days later, Coolidge's principal called Black and told her that, per the superintendent's direction, "D.B. was able to return to Coolidge." *Id.* ¶ 66. "On December 1, 2022, after missing four weeks of school, D.B. was finally allowed entry into Coolidge, where she resumed classes." *Id.* ¶ 67.

But shortly after D.B. returned to school, "there was another large group fight . . . involv[ing] D.B" and the students from "the previous incidents." ECF 1-37 ¶ 75. That led to another five-day suspension. *See id.* ¶ 76. A couple of months after that, "another group

fight . . . involving D.B." *Id.* ¶ 82. This time, a ten-day suspension. *See id.* ¶ 83. All told, D.B. was suspended for 35 days during her first year at Coolidge. *See id.* ¶ 85.

During the last of D.B.'s suspensions that year—the ten-day one in February 2023—"Coolidge staff, supported by" DCPS's central office, began "what would be an eight-month's long campaign to kick D.B. out of Coolidge." ECF 1-37 ¶ 86. Black apparently learned of that campaign in early March 2023, when someone from DCPS called her "to notify her of Coolidge's proposal to involuntarily transfer D.B. to another school." *Id.* ¶ 88. On that call, Black "rejected the proposal and was not provided any additional information." *Id.* The next day, the same employee emailed Black "to inform her of the proposed transfers again and attempted to schedule an administrative conference to discuss the involuntary transfers on March 7, 2023." *Id.* ¶ 89. The District's regulations require such a conference before a student can be expelled or involuntarily transferred. *See* D.C. Mun. Regs. tit. 5-B, § 2505.3; *id.* tit. 5-E, § 2107.1; ECF 1-37 ¶ 87. Coolidge's dean, who was cc'd on the email, also informed Black "that D.B.'s disciplinary hearing was scheduled for the same day" as the administrative conference. ECF 1-37 ¶ 89. But Black and DCPS did not "confirm[] a date for an administrative conference" and no conference was held. *Id.*

Nevertheless, on the date that DCPS had proposed holding the administrative conference, the central office employee who had been corresponding with Black about the transfer sent her a "notice of proposed involuntary transfer proposing to transfer D.B. to Dunbar High School." ECF 1-37 ¶ 90. A couple of weeks later, an "involuntary transfer hearing was held." *Id.* ¶ 91. Black's lawyer "moved for dismissal" at that hearing "for lack of due process[,] on the ground that DCPS had failed to first hold the required administrative conference." *Id.* The hearing officer agreed and "dismissed the proposed involuntary transfer . . . due to DCPS's failure to hold a required administrative conference." *Id.* ¶ 92.

A couple of weeks later, DCPS tried again "to transfer D.B." ECF 1-37 ¶ 93. The school system scheduled a meeting with Black that it described to Black as "informational." *Id.* At the meeting, however, DCPS "attempted to facilitate an administrative conference to involuntarily transfer D.B." *Id.* It did so "without providing the required notice of the proposed involuntary transfer . . . before the meeting." *Id.*; *see also* D.C. Mun. Regs. tit. 5-B, § 2505.6 (describing "written notice" requirements). The employee "who led the meeting[] determined" that Black "had not received the required notice of the proposed involuntary transfer in advance of the meeting and apologized" to Black "for the error." ECF 1-37 ¶ 94. The employee told Black that "the school [would] follow the prescribed guidelines for the issuance of documents and notification" and "concluded the meeting." *Id.*

The next month, Coolidge's dean again emailed Black "proposing dates to meet for an administrative conference to discuss their proposal to involuntarily transfer D.B." ECF 1-37 ¶ 96. This time, the "parties confirmed an administrative conference date." *Id.* "On June 7, 2023, the administrative conference was held." *Id.* ¶ 97. But Black "once again did not receive written notice of the proposed involuntary transfer at least 24 hours before the administrative conference." *Id.* Instead, "the day after the conference," Coolidge's suspension coordinator emailed Black the notice of proposed involuntary transfer. *Id.* ¶ 98.

Two weeks after the conference, Black "requested an appeal of the proposed involuntary transfer, and a hearing date was set." ECF 1-37 ¶ 99. Black again moved to dismiss the involuntary transfer, this time because of DCPS's alleged "failure to provide timely notice." *Id.* ¶ 100. And, once again, the hearing officer agreed with Black. *See id.* ¶ 101. The hearing officer found that DCPS failed "to provide a timely notice of the proposed involuntary transfer" and that this failure "prejudiced D.B." *Id.*

Undeterred, DCPS tried again to effectuate the transfer the day after this hearing. *See* ECF 1-37 ¶ 102. Now in early August 2023, the school system "again attempted to hold an administrative conference about the involuntary transfer." *Id.* "This time," Coolidge's suspension coordinator sent Black an email "to secure a date for an administrative conference and attached 12 documents," including the notice of proposed involuntary transfer. *Id.* But no administrative conference was held that August because of "scheduling conflicts." *Id.* ¶ 103.

Black did not receive anything else from Coolidge or DCPS regarding "the proposed involuntary transfer" after that email attempting to schedule the August administrative conference. ECF 1-37 ¶ 103. But when D.B. arrived at Coolidge on August 30, 2023, for the first day of her sophomore year, the school's principal told her "that she had been transferred to Dunbar High School." *Id.* ¶ 104. "The next morning," Black's lawyer emailed personnel from Coolidge and DCPS "demanding that [Black] be provided with an administrative conference and hearing." *Id.* ¶ 105. Coolidge's dean of students "responded proposing dates for an administrative conference." *Id.* Black's lawyer wrote back "and demanded permission for D.B. to attend Coolidge pending the involuntary transfer process or written notice of the basis to deny D.B. access to Coolidge." *Id.*

It is not clear if anyone responded to that demand, but "D.B. began attending Dunbar on September 5, 2023[,] because she was eager to attend school." ECF 1-37 ¶ 106. A week later, DCPS "held an administrative conference." *Id.* ¶ 107. After that conference, Black again "requested a hearing with a hearing officer to appeal the involuntary transfer." *Id.* And again, Black asked the hearing officer to "dismiss the case for lack of due process," this time because DCPS "failed to provide an opportunity for an administrative conference and hearing *before* barring D.B. from attending Coolidge as required by" the District's regulations. *Id.* ¶ 109. On October 20, 2023, a hearing officer sided, yet again, with Black. *See id.* ¶ 110. The hearing officer found that DCPS

"failed to follow" the requirements of the regulation that governs involuntary transfers "by involuntarily transferring D.B. before obtaining a hearing officer's decision on its involuntary transfer request." *Id.* (citing D.C. Mun. Regs. tit. 5-E, § 2107). The hearing officer dismissed the August 2023 involuntary transfer and ordered DCPS "to immediately allow D.B. to return to Coolidge." *Id.*

"Despite being ordered . . . to allow D.B. to return to Coolidge immediately," on the Monday following the hearing officer's decision, DCPS "continued to bar D.B." from returning to Coolidge. ECF 1-37 ¶ 111. On Tuesday of that week, a lawyer for the school system emailed Black's lawyer and relayed that D.B. was "expected to continue to attend Dunbar High School." *Id.* ¶ 112. Black's lawyer explained in response that, "in light of the hearing officer's decision," DCPS "had no basis to exclude D.B. from Coolidge." *Id.* On Wednesday, DCPS's deputy chancellor sent Black a letter "informing her that" the deputy chancellor "was exercising [her] authority as the [c]hancellor's [d]esignee to overrule or modify the hearing officer's recommendation and upholding the transfer to Dunbar." *Id.* ¶ 113.

Meanwhile, that same week, Black went to the Superior Court and, proceeding pro se, sought a temporary restraining order and preliminary injunction. *See* ECF 1-3; ECF 1-4. On Friday—a week after she secured the order from the hearing officer, and at the end of the week in which DCPS continued to bar D.B. from attending Coolidge despite the hearing officer's order—the Superior Court granted Black a preliminary injunction. *See* ECF 1-9. The court found that Black was likely to succeed on the merits of her claim that DCPS was required to comply with the hearing officer's decision. *See id.* at 3–4. After finding that the remaining factors for preliminary relief were satisfied, the court ordered DCPS to allow D.B. "to attend Coolidge Senior High School on Monday morning, Octoer 30, 2023 and every day thereafter." *Id.* at 5. The school system

complied with that order and, on October 30, 2023, D.B. returned to Coolidge. *See* ECF 1-37 ¶ 114. The court later modified the preliminary injunction to make clear that, because its injunction was meant only to "enforce" the hearing officer's order and the hearing officer did not bar DCPS from trying again to effectuate D.B.'s involuntary transfer, the injunction did not "restrict the District from taking any procedurally appropriate additional disciplinary action." ECF 1-18 at 3–4.

After the modification, Black—now represented by counsel—moved to amend her complaint. *See* ECF 1-30. The Superior Court granted that motion and Black filed her first amended complaint. *See* ECF 1-37; ECF 1 ¶ 4. Because Black's amended complaint added two new federal claims—both alleging a violation of D.B.'s procedural due process rights—the District and individual defendants—DCPS and Coolidge employees—removed the case from the Superior Court to this one. *See* ECF 1-37 ¶¶ 115–151; ECF 1 ¶¶ 5–6.

Now pending here is the first amended complaint Black filed in the Superior Court. *See* ECF 1-37. In that complaint, Black brings three claims on behalf of D.B. *See id.* ¶ 2. First, that the defendants violated D.B.'s procedural due process rights when they suspended her the first time—between October 27, 2022, and November 30, 2022—without "formal notice of the suspension," "a conference, or a hearing." *Id.* ¶¶ 121, 123. Second, that the defendants violated D.B.'s procedural due process rights whey they "barred [her] from attending Coolidge in August 2023" without notice and a hearing. *Id.* ¶¶ 140–41, 143. And third, that the defendants violated the District of Columbia's Fair Access Act in various ways during D.B.'s suspensions. *See id.* ¶¶ 154–58. Black named as defendants the District of Columbia; George Greenhow—the dean of students at Coolidge; Semanthe Bright—the principal at Coolidge; Kimberly Martin—the instructional superintendent who oversaw Coolidge; and Lewis Ferebee—the chancellor of DCPS. *See*

*id.* ¶¶ 3–7. The first count runs against all of the defendants, the second against all but Greenhow, and the third against the District only. *See id.* at 23, 27, 30. The Court refers to the defendants collectively as the District.

The District filed a partial motion to dismiss. *See* ECF 5-1. In that motion, it asked the Court to dismiss counts one and two "entirely," "any claim for damages under" count three, as well as "any request for forward-looking declaratory or injunctive relief." *Id.* at 4; *see also id.* at 33 (similar request in conclusion). It seems that the District would allow some litigation under count three—not related to "injunctive relief prohibiting future actions by District employees," but perhaps oriented towards Black's request that the District take affirmative steps to ameliorate harms from D.B.'s suspension and involuntary transfer—to go forward. *Compare* ECF 5-2 at 1 (District's proposed order), *with* ECF 1-37 at 33 (requests for relief in paragraphs (F), (G), and (H)). There is ultimately no need to decipher exactly what the District would allow to proceed because, at most, it has not moved to dismiss some aspects of count three and, as explained below, the Court is not retaining supplemental jurisdiction over that claim.

## II. LEGAL STANDARD

"To survive" a Rule 12(b)(6) "motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court "must treat the complaint's factual allegations as true, and must grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged." *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023).

## III. ANALYSIS

Black brings three claims, the first two alleging violations of the procedural component of the Fifth Amendment's due process clause, and the third alleging violations of the District of Columbia's Fair Access Act. The Court concludes that neither of the federal constitutional claims

are plausible so dismisses them under Rule 12(b)(6). Having done so, it opts not to retain supplemental jurisdiction over the remaining state law claim. Before turning to each of the claims, the Court briefly addresses Black's standing to seek each of the "form[s] of relief" sought in the complaint. *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).

**A. Black lacks standing to challenge future suspensions or transfers but has standing to seek damages and other relief that remediates D.B.'s past suspensions and transfer.**

At the threshold, there is a dispute about Black's standing to seek some, but not all, of the forms of relief requested in the complaint. The District does not contest Black's standing to seek monetary damages for D.B.'s past suspensions and involuntary transfer. *See* ECF 5-1 at 31–33. That choice is a sound one, and the Court has no doubt that being barred from attending the school of one's choosing constitutes a cognizable injury in fact. *See, e.g.*, *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (holding that plaintiff who wishes to attend a university can challenge its admissions policies that prevent him from doing so). On Black's theory, D.B. suffered that injury because of the District's violations of the Fifth Amendment and state law, and that injury could be redressed by an award of damages. That is sufficient at this stage to establish her standing to seek monetary relief for these past injuries.[2]

The District does, however, argue that Black lacks standing to seek "prospective injunctive relief." ECF 5-1 at 33. In particular, the District argues that Black lacks standing to seek declaratory relief or an injunction "prohibiting" the District "from seeking to suspend or involuntarily transfer D.B. from Coolidge without following the process set forth under D.C. law."

[2] As D.B.'s mother, Black "may maintain litigation that rests directly on the standing" of D.B. herself. *Pub. Citizen v. FTC*, 869 F.2d 1541, 1550 (D.C. Cir. 1989). The Court's analysis here therefore considers what forms of relief D.B. would have standing to seek in this case. Although she might have been able to do so, Black has not articulated any separate injury that she personally suffers. *See id.* (discussing parents' interest in "welfare and health of the child").

*Id.* at 31 (quoting ECF 1-37 at 33). The District is right that Black lacks standing to seek this forward-looking relief.

"To establish standing for prospective relief," Black "must plausibly allege facts that show the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Jones v. U.S. Secret Serv.*, 143 F.4th 489, 495 (D.C. Cir. 2025). The only harm Black seeks to prevent is D.B.'s future "exclus[ion] . . . from school in violation of applicable law." ECF 9 at 38. As Black rightly argues, that the District previously suspended and sought to transfer D.B. is "evidence" that can be used to show "a real and immediate threat of repeated injury." *Jones*, 143 F.4th at 495. But that allegation is not sufficient here to establish a risk of future injury. The District's previous suspensions were based on D.B.'s participation in "group fight[s]," ECF 1-37 ¶¶ 47, 75, 82, and, as Black acknowledges in her briefing, the eventual effort to transfer D.B. was "based on" the fighting incidents, as well, ECF 9 at 12. Because nothing in D.B.'s complaint suggests she intends to engage in similar group fights or misconduct in the future, there is no reason to think the school will again suspend or transfer her. Indeed, at this point D.B. has been back at Coolidge since October 2023 and, based on when she began her freshman year, may well have graduated. *See* ECF 1-37 ¶¶ 35, 114. Even if she has not yet graduated, it seems unlikely the school will again try to suspend or transfer her based on these years-old issues. Because that possibility is highly speculative, Black lacks standing to seek prospective relief to prevent it.

That leaves a few other forms of injunctive relief listed in the complaint's prayer for relief that the District seemingly does not argue Black lacks standing to seek. *Compare* ECF 5-2 at 1 (District's proposed order), *with* ECF 1-37 at 33 (items (F), (G), and (H)). Each of these forms of injunctive relief seek to remediate the past harms from D.B.'s suspension—by, for instance, requiring the District "to remove any reference to the October 2022 suspension and 2023

involuntary transfers from D.B.'s school record" and to "provide an education plan to allow D.B. to make up any missed education during the time that she was suspended." ECF 1-37 at 33. Because these forms of injunctive relief seek to remediate the ongoing effects of the District's alleged misconduct, Black does have standing to seek them. *See Pappas v. District of Columbia*, No. 19-cv-2800, 2024 WL 1111298, at *13 (D.D.C. Mar. 14, 2024) (explaining that "plaintiffs have standing to seek injunctive or declaratory relief for their past injury, provided plaintiffs continue to suffer"). So although Black lacks standing to prevent some speculative future suspension or involuntary transfer, she does have standing to seek the forms of injunctive relief listed in her complaint that would remediate the effects of D.B.'s prior suspensions and transfer.

**B. Black fails to state a procedural due process claim in count one.**

In count one, Black alleges that D.B.'s "20 day suspension" between October 27, 2022, and November 30, 2022, violated the Fifth Amendment's due process clause because D.B. was suspended without "formal notice of the suspension, . . . a conference, or a hearing." ECF 1-37 ¶ 123. As the complaint makes clear, District regulations do guarantee students in D.B.'s position notice and an opportunity to be heard. *See* ECF 1-37 ¶ 20; *see also* D.C. Mun. Regs. tit. 5-B, § 2505.3–.6. The problem, according to the complaint, is that the staff at Coolidge and the central office failed to follow these regulations in relation to D.B.'s 20-day suspension. *See* ECF 1-37 ¶¶ 52, 56, 59, 63, 68, 70. Relying on the Supreme Court's decisions in *Parratt v. Taylor*, 451 U.S. 527 (1981), and *Hudson v. Palmer*, 468 U.S. 517 (1984), the District argues that this sort of "random, unauthorized, and unforeseeable mistake[]" does not constitute a procedural due process violation because "there is no procedural step, or amount of process" that could have prevented the mistake. ECF 5-1 at 13–14.

The District is right to rely on those cases. In them, the Court explained that, "[b]ecause the losses" from a "random and unauthorized" "act are not the result of any state procedure, and

because the state cannot predict when such losses will occur, such acts are not violations of the due process clause so long as there is an adequate post-deprivation remedy." *Tri Cnty. Indus., Inc. v. District of Columbia*, 104 F.3d 455, 460 (D.C. Cir. 1997) (citing *Parratt*, 451 U.S. at 451–52). That rule "represent[s] a special case of the general *Mathews v. Eldridge*[, 424 U.S. 319 (1976),] analysis." *Zinermon v. Burch*, 494 U.S. 113, 128 (1990). In cases that fall within this rule, "one of the variables in the *Mathews* equation—the value of predeprivation safeguards—is negligible in preventing the kind of deprivation at issue." *Id.* at 129. That is because the deprivation is not the "result of some established state procedure," but instead is caused by an act "the State cannot predict." *Parratt*, 451 U.S. at 541. "It is difficult to conceive of how the State could provide a meaningful hearing" before a deprivation takes place for this sort of unpredictable reason, *id.*, and "the State cannot be required constitutionally to do the impossible," *Zinermon*, 494 U.S. at 129.

D.B.'s complaint about her 20-day suspension presents precisely this problem for the District. The District already requires schools to "provide[] written notice of all" suspensions and to hold "a conference" with students "prior to" any suspension, unless the suspension is made in emergency circumstances, in which case the conference must be "held no more than three" school days after the suspension starts. D.C. Mun. Regs. tit. 5-B, § 2505.3, .6. The District also guarantees students an "opportunity" to be heard at those conferences and an appeals process. *Id.* § 2505.4(c), .14–.15. Those are precisely the procedural protections Black says D.B. was not afforded in relation to her 20-day suspension. *See* ECF 1-37 ¶¶ 123, 125. The problem, as Black puts it in her complaint, is that the school officials failed to do what these "D.C. regulations require." *Id.* ¶ 126.

Regardless of whether the school officials violated these rules intentionally or unintentionally, it is difficult to see what more the District could have done to ensure that D.B. received the requisite process before her suspension. *See Zinermon*, 494 U.S. at 128–30 (discussing

intentional and negligent deviations from "established state procedure[s]"). Should the District have provided D.B. with a hearing to determine whether she would receive notice and a hearing? Required the school to give her notice that she was entitled to notice? Those requirements "would, of course, be absurd," and in a case like this one where the school officials failed to follow the District's rules anyways, meaningless. *Bogart v. Chapell*, 396 F.3d 548, 562 (4th Cir. 2005). That reality confirms that this is a procedural due process claim in which "the value of predeprivation safeguards . . . is negligible." *Zinermon*, 494 U.S. at 129.

That it is difficult to imagine what additional process the District could have provided to ensure D.B. received the process the District already guaranteed does not, standing alone, bring this case within the rule of *Parratt* and *Hudson*. The rule from those cases only applies when "meaningful postdeprivation remed[ies]" are "available" to ameliorate the loss at issue. *Hudson*, 468 U.S. at 533; *see also Parratt*, 451 U.S. at 543–44. In those two cases, the remedy was a state law "tort claim[]" that could compensate the plaintiff for their loss of property. *Parratt*, 451 U.S. at 543; *see also Hudson*, 468 U.S. at 535–36. Here, the District says that D.B.'s remedy is a suit for "injunctive relief in the Superior Court for the District of Columbia, through that court's general equitable jurisdiction." ECF 5-1 at 15.

The District is right "that the Superior Court may entertain claims for equitable relief from allegedly unlawful action by public officials." *District of Columbia v. Sierra Club*, 670 A.2d 354, 358 (D.C. 1996). Indeed, this case provides an example: Before the case was removed, the Superior Court granted Black an injunction allowing D.B. to return to Coolidge. *See* ECF 1-9. The availability of the equitable remedy thereby ensures that students in D.B.'s position can undo their unlawful suspensions even if they are erroneously deprived of the state law-required predeprivation process.

And whether the availability of equitable relief, but not damages, is enough to satisfy *Parratt* and *Hudson*'s requirements is a question the Court need not answer in this case. Under D.C. law, "government official[s] may be sued for negligent and intentional torts" if their actions strayed beyond "the outer perimeter of [their] official duties" and "the particular government function at issue was . . . ministerial." *Gordon v. District of Columbia*, 309 A.3d 543, 559 (D.C. 2024). Under those rules, D.B. could attempt to recover monetary damages based on the school officials' alleged failure to follow D.C. law when they suspended her for 20 days. D.B. may or may not be able to make the required showings to prevail in that lawsuit, but it is sufficient for present purposes to note that she would have the opportunity to do so in a postdeprivation hearing. *See Parratt*, 451 U.S. at 544 (noting that "state remed[y]" need not "provide" plaintiff "with all the relief which may have been available" in a suit under 42 U.S.C. § 1983); *cf. Doe ex rel. Fein v. District of Columbia*, 93 F.3d 861, 870–71 (D.C. Cir. 1996) (per curiam) (explaining that plaintiff is not deprived of due process merely because they might lose in postdeprivation hearing).

So at least at first blush, count one falls within the *Parratt* and *Hudson* doctrine. Pushing back, Black argues that "D.B.'s suspension was not the result of one isolated incident made by a low-level government employee," and instead that D.B.'s rights were "continually and repeatedly" violated "over the course of months." ECF 9 at 21. If the complaint actually alleged anything like that, this claim might well fall outside of the *Parratt* and *Hudson* doctrine. Based on such a pattern, D.B. could likely identify "a predictable point" in the "process" where students are being denied the required process and, based on that "predictable" failure, show that there are additional procedural safeguards that could make a difference. *Zinermon*, 494 U.S. at 139. But this argument is unmoored from the claim Black pled in count one. Although the complaint references D.B.'s suspensions later in her freshman year, count one is squarely focused on the first suspension—the

20-day one that ran "from October 27, 2022 until November 30, 2022." ECF 1-37 ¶ 123. The claim at issue, then, focuses on the school officials' failure to provide the required process in relation to that suspension, not any of the other suspensions.

And even accounting for the later suspensions, Black has not even attempted—neither in the complaint nor her briefing—to identify a "predictable" gap in the District's procedures that leads to erroneous suspensions and that could be remedied by some additional "predeprivation process." *Zimermon*, 494 U.S. at 136–37. In fact, Black has not identified any additional procedural safeguard that should have been used in this case beyond those already required by District law. Nor—even assuming school officials repeatedly deprived D.B. of her procedural rights when suspending her—is this a case where the District "delegated" to the school officials discretion in determining how "to initiate the procedural safeguards set up by state law." *Id.* at 138. Instead, the suspension regulations mandate that school officials "shall" provide notice and an opportunity to be heard. D.C. Mun. Regs. tit. 5-B, § 2505.3–.4, .6. That makes it clear that the school officials' failure to provide D.B. with those procedural protections was "unauthorized," and that there are no means by which the District could have further "limited and guided" the school officials' conduct to prevent them from violating the District's regulations. *Zinermon*, 494 U.S. at 137–38.

This is, then, a case "where postdeprivation process is all that is due because no predeprivation safeguards would be of use in preventing the kind of deprivation alleged." *Zinermon*, 494 U.S. at 139. Count one therefore fails to plausibly allege a procedural due process violation. In reaching that conclusion, the Court stresses the case-specific nature of this holding. It is not the case that a procedural due process claim fails merely because the defendant's actions violated some state or federal law. Instead, it is the unique circumstances of this case that lead to

that result: the presence of adequate postdeprivation remedies—including both equitable and monetary relief; the lack of any pattern or systemic flaw that suggests additional procedural safeguards would make a difference; the fact that, on Black's theory of the case, the school officials have no "delegated power" to forego the required predeprivation process; and that Black has not suggested a "state procedure" or "system" led to the school officials' failure to provide the required predeprivation procedure. *Armstrong v. Daily*, 786 F.3d 529, 543–44 (7th Cir. 2015) (outlining important limits on scope of *Parratt* and *Hudson*).

**C. Black fails to state a procedural due process claim in count two.**

In count two, Black challenges D.B.'s involuntary transfer from Coolidge to Dunbar High School at the beginning of D.B.'s sophomore year. *See* ECF 1-37 ¶ 141. Black says that transfer was effectuated without providing D.B. notice and a hearing. *See id.* ¶¶ 141–43. This claim fails for the simple reason that D.B. received actual notice and an opportunity to be heard prior to the involuntary transfer.

The complaint alleges that the "eight-month's long campaign to kick D.B. out of Coolidge" began around February 2023. ECF 1-37 ¶¶ 82–83, 86, 88. Black received, for the first time, a "Notice of Proposed Involuntary Transfer" on March 7, 2023. *Id.* ¶ 90. She received another notice on June 8, 2023, and a third on August 3, 2023. *See id.* ¶¶ 98, 102. As Black herself puts it, all of these notices of involuntary transfer "concern[ed] the same conduct." ECF 9 at 13. Meanwhile, the District held an "involuntary transfer hearing" on March 24, 2023, a meeting with Black on April 7, 2023, an "administrative conference" on June 7, 2023, and another involuntary transfer hearing on August 2, 2023. ECF 1-37 ¶¶ 91, 93, 97, 99, 101. These notices and hearings preceded D.B.'s involuntary transfer at the end of August 2023. *See id.* ¶ 104. And, importantly, several of the hearings were held *after* Black and D.B. received the notices proposing the involuntary transfer. Black received the first notice, for instance, before the June administrative conference, and

received two such notices before the August involuntary transfer hearing. *See id.* ¶¶ 90, 97–98, 101. Given this sequence, there is little doubt that D.B. and Black both were given "notice of the charges" underlying D.B.'s proposed involuntary transfer and, at hearings following their receipt of the notice, "an opportunity to present [D.B.'s] side of the story." *Goss v. Lopez*, 419 U.S. 565, 581 (1975).

To be sure, accepting the allegations in the complaint as true, the District repeatedly violated its own regulations in the manner and sequence that it provided the notices and held the hearings. School officials acknowledged those failures, *see* ECF 1-37 ¶ 94, and hearing officers repeatedly dismissed D.B.'s involuntary transfer because of these issues, *see id.* ¶¶ 92, 101, 110. The Superior Court ultimately ordered the District to allow D.B. to return to Coolidge because of these violations of the District's regulations, too. *See* ECF 1-9 at 3–5. But a "mere violation of [D.C.] law does not give rise to a due process claim." *Pearson v. District of Columbia*, 644 F. Supp. 2d 23, 48 (D.D.C. 2009). That is because "the procedures required before a person may be deprived" of a constitutionally protected interest "are derived not from" D.C.'s regulations, "but from the Constitution itself." *Duckett v. Quick*, 282 F.3d 844, 848 (D.C. Cir. 2002). And here, D.B. and Black "received *actual* notice" of the District's proposed transfer of D.B., *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010), and several opportunities to present D.B.'s case "in a meaningful manner," *Gray Panthers v. Schweiker*, 652 F.2d 146, 148 n.3 (D.C. Cir. 1980). That "more than satisfied [D.B.'s] due process rights." *Espinosa*, 559 U.S. at 272.

### D. The Court will not exercise supplemental jurisdiction over the remaining state law claim.

Neither of Black's two federal constitutional claims survive the District's motion to dismiss. The only remaining claim—count three—is a state law claim asserting a violation of the District's Fair Access Act. *See* ECF 1-37 ¶¶ 152–62. The "Court originally had supplemental

jurisdiction" over that claim because it "formed part of the same case or controversy as the federal claims over which it had original jurisdiction." *Pollard v. District of Columbia*, 191 F. Supp. 3d 58, 82 (D.D.C. 2016). With the federal claims gone, the Court has discretion "to decline to exercise supplemental jurisdiction" over the remaining state law claim. 28 U.S.C. § 1367(c)(3).

The Court will exercise that discretion and dismiss the state law claim without prejudice so that it can be refiled in the Superior Court. *See Pollard*, 191 F. Supp. 3d at 83. It opts for that path principally because the claim raises a "novel" issue of D.C. law—whether there is a private right of action to enforce the Fair Access Act—but also because neither the parties "nor the Court has expended the significant kind of resources in discovery or for trial that might create countervailing fairness or judicial-economy concerns." *Manyan v. District of Columbia*, No. 23-cv-3192, 2025 WL 2759036, at *3, *5 (D.D.C. Sept. 26, 2025).

* * *

The District's partial motion to dismiss, ECF 5, is **GRANTED**, and the Court declines to exercise supplemental jurisdiction over the remaining state law claim. This case is, therefore, dismissed. A separate order will issue.

**SO ORDERED.**

JIA M. COBB
United States District Judge

Date: September 4, 2026